NO CV30

FEE PAD

Matthew A. Brinegar, Esq. (SBN 277517)
THE BRINEGAR LAW FIRM
2000 Van Ness Avenue, Suite 512
San Francisco, CA 94109
Telephone: (415) 735-6856
Facsimile: (415) 529-4276
E-mail: mbrinegar@brinegarlaw.com

Attorney for Relator/Plaintiff,
Mahnaz Rahbar, M.D.

**FILED**
CLERK, U.S. DISTRICT COURT

MAY 24 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___EEE___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA AND ) Case No.: **2:22-CV-03520-CAS(PDx)**
STATE OF CALIFORNIA *ex rel*. MAHNAZ )
RAHBAR, M.D., )
                                      )
            Relator/Plaintiff,        ) **JURY TRIAL DEMANDED**
                                      )
        vs.                           ) **[FILED IN CAMERA AND UNDER SEAL**
                                      ) **PURSUANT TO 31 U.S.C. § 3730(b)(2);**
STERLING HOSPITALIST MEDICAL          ) **CAL. GOV. CODE§ 12652(c)(2)]**
GROUP, INC.; TITANIUM HEALTHCARE,     )
INC; AND DOES 1-20.                   )
                                      )
            Defendants.               )
                                      )
                                      )
                                      )
                                      )
_____)

    Plaintiffs, the United States of America ("United States") and the State of California, by

and through Relator/Plaintiff Mahnaz Rahbar, M.D. ("Dr. Rahbar" or "Relator" or "Plaintiff"),

by and through the undersigned counsel, allege as follows:

//

//

//

1

# I.
## <u>INTRODUCTION</u>

1.      Relator brings this action on behalf of the United States and the State of California to recover losses sustained by Medi-Cal, a joint federal and state program, and Medicare as a result of Defendants' fraudulent billing practices.

2.      Defendants have perpetrated a fraud on the taxpayers by falsifying records to bill for medical services, including submitting claims to Medi-Cal and Medicare for services provided by nurse practitioners and physician assistants who were not supervised by a physician, and causing to be presented claims for laboratory tests and radiology examinations with the Relator as the "ordering physician" or "referring provider," even though she had not ordered the tests or examinations, nor supervised the mid-levels who had.

3.      Medi-Cal and Medicare prohibit billing for services performed by Non-Physician Medical Providers ("NMPs"), including nurse practitioners and physician assistants, when they are not supervised by a physician. Medi-Cal and Medicare also prohibit the falsification of the "referring provider" on CMS Form 1500 when ordering tests. Therefore, neither Medi-Cal nor Medicare would have paid these claims if they had known that the NMPs were not supervised and that the "referring provider" on the CMS Form 1500 had not ordered the test, nor supervised the NMPs that had.

4.      Relator discovered Defendants' scheme when Sterling Hospitalist Medical Group, Inc.'s Chief Medical Officer, Dr. Joe Jordan, asked her to be the provider for Medi-Cal and Medicare patients on paper for "Extra $$!." Unbeknownst to Relator she had already been listed as the provider for those patients for several months prior to Dr. Jordan's "request."

5.      Defendants' practices resulted in numerous violations of the Federal False Claims Act and the California False Claims Act. This is a *qui tam* action to recover treble damages, civil penalties, attorneys' fees, and costs for Relator on behalf of both the United States and the State of California.

6.      The Relator, through investigation and inside knowledge of Defendants' operations, has obtained non-public, direct evidence supporting the allegations in this Complaint. Among other evidence, Relator has obtained and/or compiled based on first-hand information records of medical billing, scheduling, financial records, and other evidence that show the submission of fraudulent medical billing that underlie the scheme at issue.

## II.
## PARTIES

7.      Plaintiff in this action is the United States of America and the State of California by and through Relator.

8.      Dr. Rahbar is an internist. She has held an unrestricted California medical license since 2008. She has never been sued for malpractice. Nor has any of her medical staff privileges been restricted in any manner. Relator is a resident of Los Angeles County.

9.      Relator has direct and independent knowledge of the information on which these allegations are based.

10.      The facts alleged in this Complaint are based entirely upon Relator's personal observation and investigation, as well as documents in her possession.

11.       Defendant Sterling Hospitalist Medical Group, Inc. ("Sterling") is a California professional corporation doing business in Los Angeles County, California. Sterling provides medical services to patients in Los Angeles County, principally to patients enrolled in Medi-Cal

1    and Medicare HMO plans. Relator worked at Sterling from November 16, 2018 until March 31,

2    2022.

3           12.     Defendant Titanium Healthcare, Inc. ("Titanium") is a California corporation

4    doing business in Los Angeles County, California. Titanium ostensibly is a management

5    services organization that provides administrative services to Sterling.
6
7           13.     Defendants DOES 1 through 20, inclusive, are sued herein under fictitious

8    names. Their true names and capacities are unknown to Relator. When their true names and

9    capacities are ascertained, Relator will amend this Complaint by inserting their true names and

10   capacities herein. Relator is informed and believes, and thereon alleges, that each of the

11   fictitious named Defendants is responsible in some manner for the occurrences herein alleged,
12
13   and that Plaintiff's damages as alleged were proximately caused by Defendants.

14                                              **III.**
                                     **JURISDICTION AND VENUE**
15
16          14.     This Court has jurisdiction over the False Claims Act ("FCA") causes of action

17   raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law. This Court also

18   has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for
19
20   claims brought under the FCA on the District Courts of the United States.

21          15.     Additionally, this Court has supplemental jurisdiction over the other claims in

22   this action pursuant to 31 U.S. Code § 3732(b), as they arise from the same transaction or

23   occurrence as the federal claims. The Court also has supplemental jurisdiction pursuant to

24   28 U.S.C. § 1367, as they are so related to the FCA claims in this action that they form part of
25
26   the same case or controversy.

27          16.     Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact

28   business in this district, and the fraudulent conduct was committed here.

# IV.
## Statutory Background

**A.    Federal False Claims Act**

17.    The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(l)(l)(A).

18.    The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

19.    As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B).

20.   The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b); 31 U.S.C. § 6 3729(b)(l)(B).

**B.   The Medicare Program**

21.   Part B of the Medicare program pays for "medical and other health services," 42 U.S.C. § 1395k(a), which includes services performed by nurse practitioners "working in collaboration ... with a physician ... which the nurse practitioner ... is legally authorized to perform by the State in which the services are performed." 42 U.S.C. § 1395x(s)(2)(K)(i)-(ii). The term "collaboration" is defined as "a process in which a nurse practitioner works with a physician to deliver health care services within the scope of the practitioner's professional expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms as defined by the law of the State in which the services are performed." 42 U.S.C. § 1395x(aa)(6). A nurse practitioner or a physician assistant is one "who performs such services as such individual is legally authorized to perform (in the State in which the individual performs such services) in accordance with State law." 42 U.S.C. § 1395x(aa)(5).

22.   All claims for diagnostic laboratory tests must contain the legal name and national provider identifier ("NPI") of the physician or eligible professional who ordered the test. 42 CFR § 424.507(a)(1)(ii).

23.   Furthermore, the Medicare Program Integrity Manual, Chapter 4 – Program Integrity, provides a detailed list of "Examples of Medicare Fraud," including

"Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnished the services." Indeed, Section 4.18.1.2 of the Medicare Program Integrity Manuel requires "immediate advisement" of the OIG/OI if there "attestations from referring/ordering providers indicating they did not refer/order a service …."

24.    Compliance with the regulations and the Medicare Program Integrity Manuel are conditions of payment for claims made to the Medicare and Medi-Cal programs.

C.    **The California False Claims Act**

25.    The California False Claims Act provides in pertinent part that a person is liable to the State of California for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Cal. Gov. Code§ 12651(a)(l).

26.    The California False Claims Act defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions: (A) is presented to an officer, employee, or agent of the state or of a political subdivision; (B) is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions (i) provides or has provided any portion of the money, property, or service requested or demanded; or (ii) reimburses the contractor, grantee, or other recipient for any portion of the money, property,

or service which is requested or demanded." Cal. Gov. Code §1265l(b)(l).

### D. The Medi-Cal Program

27. Medicaid was created on July 30, 1965, through Title XIX of the Social Security Act. Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. 42 U.S.C.S. § 1396 et seq.

28. Each state administers its own Medicaid Program. However, each state program is governed by federal statutes, regulations and guidelines. The federal portion of a state's Medicaid payments-the Federal Medical Assistance Percentage-is based on the state's per capita income compared to the national average.

29. The law requires state Medicaid plans to execute written agreements between the Medicaid agency and each provider furnishing services under the plan ("Provider Agreement"). 42 C.F.R. § 431.107(b).

30. The California Department of Health Care Services ("DHCS") enacts regulations for California's State Medicaid program, Medi-Cal. As participating Medi-Cal providers, Defendants were and are subject to DHCS regulations.

31. Defendants, as Medi-Cal providers, are required to complete a Medi-Cal Provider Agreement (DHCS Form 6208).

32. Among other commitments, as part of the Medi-Cal Provider Agreement, Defendants agreed to, *inter alia,* comply with the laws and regulations, not to engage in fraud and abuse and keep, and to maintain all necessary records.

33. 22 § CCR 51240 addresses enrollment and supervision requirements for Non-Physician Medical Providers ("NMPs").

34.   22 § CCR 51240 (a) states, "Each primary care physician organized outpatient clinic … shall complete a "Medi-Cal Nonphysician Medical Practitioner and Licensed Midwife Application," DHS 6248 (Rev. 07/05) for enrollment in the Medi-Cal program pursuant to Section 51000.30."

35.   22 § CCR 51240 (d) states:

> Each primary care physician organized outpatient clinic … shall develop a Physician-Practitioner Interface specifically establishing the scope and limits of services to be rendered by, and related to the functions of, each nonphysician medical practitioner. (1) A Physician-Practitioner Interface includes the following: (A) In the case of registered nurses, standardized procedures, as required by Title 16, Article 7, Division 14, California Code of Regulations, commencing with Section 1470. (B) In the case of physician assistants, a written delegation of medical services and written supervisory guidelines, as required by Section 1399.540 and Section 1399.545(e), Title 16, California Code of Regulations ...

36.   DHCS publishes a manual that describes proper billing for NPMs, which is available at https://files.medi-cal.ca.gov/pubsdoco/publications/masters-mtp/part2/nonph.pdf.

37.   Among other requirements, the manual states, "The services of PAs [physician assistants] may be billed to Medi-Cal only if the following criteria are satisfied … Services rendered by a PA must be performed under the general supervision of a physician."

38.   Similarly, the manual states, "The services of NPs [nurse practitioners] may be billed to Medi-Cal only if the following criteria have been satisfied … Services rendered by an NP must be performed under the general supervision of a physician."

39.   22 § CCR 51502 (a) states, "All charges submitted for payment shall be on billing forms approved by the Director. Unless otherwise prescribed by the Director, the following shall be included on or attached to each billing form: … The Medi-Cal provider number or license number, when different than the billing provider, for the following: …

(D) The ordering or prescribing physician, dentist or podiatrist, when the service claimed by the provider requires an order or prescription by a licensed practitioner as defined by California law."

40.   The DHCS manual and the regulations constitute conditions of payment for claims to the Medi-Cal program.

# IV.
## STATEMENT OF FACTS

**A.  Facts in Support of False Claims Act Violations**

41.   Dr. Rahbar began working for Sterling in or around November 16, 2018.

42.   As part of her job duties, Dr. Rahbar treated patients at a downtown Los Angeles clinic, located at 1414 South Grand Avenue, #475, Los Angeles, CA 90015 ("Downtown Clinic"). Said clinic is owned by Titanium Healthcare, which is Sterling's "friendly" management services organization. Sterling or Titanium Healthcare staffed the clinic with physician assistants and nurse practitioners.

43.   Most of Dr. Rahbar's patients were Medi-Cal recipients. Some of her patients were also "dual eligibles," meaning they were Medi-Cal *and* Medicare beneficiaries

44.   On or about September 2021, Sterling's Chief Medical Officer, Dr. Joe Jordan, spoke with Dr. Rahbar about being the provider on paper for patients that would be seen at 933 South Sunset Ave., #101, West Covina, CA 91790 ("West Covina Clinic") and 6300 Florence Avenue, Bell Gardens, CA 90201 ("Bell Gardens Clinic"). Said clinics are also owned by Titanium Healthcare.

45.   These patients belonged to various independent practice associations ("IPA"), including South Atlantic Medical Group, IPA and Lakeside Community Healthcare. An IPA is an association of physicians that contracts to provide medical care to HMO members in the

physicians' own offices. The vast majority of those patients were Medi-Cal beneficiaries. Some were insured by Blue Shield of California Promise Health Plan, which offers both a Medi-Cal plan and a plan for "dual eligibles." Some patients were insured by Anthem MediBlue HMO, which is a Medicare Advantage plan.

46.     Without her knowledge or consent, Dr. Rahbar was assigned "patient panels" for each of these IPA or plans. These patient panels consisted of individuals that she was supposedly responsible for treating, either personally or through the NMPs that she supervised.

47.     Dr. Rahbar refused to provide her consent to be listed as the provider for these patients, despite Dr. Jordon's entreaties via text on November 1, 2021 that "It really only involves a letter. There is no requirement to be there" and "Extra $$!."

48.     In fact, without her knowledge or consent, Sterling and Titanium had already assigned these West Covina Clinic and Bell Garden Clinic patient panels to Dr. Rahbar at least four months prior to Dr. Jordan's texts.

49.     As a result of the unauthorized assignment of patient panels to Dr. Rahbar, she was listed as the "ordering physician" or "referring provider" for dozens of tests for patients that she has never seen, much less treated. Moreover, the NMPs, including Andrea Kynard, NP and Michael Ocampo, PA, treated Medi-Cal and Medicare patients hundreds of times without being supervised by a physician.

50.     Sterling and Titanium submitted these claims to Medi-Cal and Medicare for primary care visits knowing that the NMPs were not supervised by a physician. Moreover, it caused to be presented numerous claims to Medi-Cal and Medicare for laboratory tests, including blood tests, pap smears, and radiology examinations, by fraudulently listing Relator as the "ordering physician" or "referring provider" when she neither saw the patients nor supervised the NMPs that did.

51.    For example, PA Ocampo saw a Medi-Cal patient on November 20, 2021 at the Bell Gardens Clinic when he was not supervised by Relator or any other physician. He also ordered a pap smear for the patient on August 3, 2021, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised PA Ocampo.

52.    NP Kynard saw a Medi-Cal patient on February 2, 2022 and February 8, 2022 at the West Covina Clinic when she was not supervised by Relator or any other physician. She also ordered a blood test for the patient on January 20, 2022, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised NP Kynard.

53.    PA Ocampo saw a Blue Shield of California Promise Health Plan patient on December 29, 2021 at the Bell Gardens Clinic when he was not supervised by Relator or any other physician. He also ordered a blood test on the same date, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised PA Ocampo.

54.    NP Kynard saw a Medi-Cal patient on January 6, 2022 at the West Covina Clinic when she was not supervised by Relator or any other physician. She also ordered a pap smear for the patient on the same date, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised NP Kynard.

55.    PA Ocampo saw a Medi-Cal patient on March 20, 2022 at the Bell Gardens Clinic when he was not supervised by Relator or any other physician. He also ordered a blood test on April 2, 2022, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised PA Ocampo.

56.    NP Kynard saw a Medicare patient on January 6, 2022 at the West Covina Clinic when she was not supervised by Relator or any other physician. She also ordered a blood panel for the patient on the same date, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised NP Kynard.

57.    NP Kynard saw a Medi-Cal patient on November 11, 2022 at the Bell Gardens Clinic when she was not supervised by Relator or any other physician. She also ordered a radiology examination for the patient on February 3, 2022, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised NP Kynard.

58.    PA Ocampo saw a Medi-Cal patient on February 9, 2022 at the Bell Gardens Clinic when he was not supervised by Relator or any other physician. He also ordered a blood test on January 26, 2022, and Relator's name was listed as the "ordering physician" when she neither saw the patient nor supervised PA Ocampo.

59.    Sterling and Titanium assigned patient panels to Dr. Rahbar without her prior knowledge or consent, because it needed a doctor on paper to "supervise" NMPs to bill Medi-Cal and Medicare. By having NMPs care for patients without any real supervision, they would achieve higher profits at the expense of appropriate patient care.

**B. Additional Facts in Support of Relator's Individual Claims**

60.    On or about February 3, 2022, Dr. Rahbar learned that she was still the physician for the West Covina Clinic and Bell Garden Clinic patient panels, which had been assigned by Sterling and Titanium to her without her prior knowledge or consent. The following day, Dr. Rahbar demanded that she be removed from the patient panels.

61.    On or about February 10, 2022 and February 11, 2022, Sterling and Titanium finally notified two IPAs that Dr. Rahbar should be removed from these patient panels.

62.    On or about February 23, 2022, Dr. Rahbar demanded in writing that Sterling and Titanium provide her a "complete disclosure" of all patient assignments, so that she could discover whether she had been assigned to additional patient panels without her authorization.

63.    Dr. Rahbar repeated this demand in writing on March 21, 2022.

64.    To date, Sterling and Titanium have refused to provide a complete disclosure to Dr. Rahbar of all patient panels that they had assigned to her. She, therefore, does not know whether Sterling or Titanium assigned her to other patient panels without her knowledge or consent.

65.    While a "memorandum of understanding" between her and Sterling stated that she was an independent contractor, Sterling had the right to control how she performed her job, including supervising NPMs "as assigned." Sterling also dictated her patient load and when she could see those patients. Moreover, Sterling paid her on hourly basis, and she could be terminated "without cause." Sterling issued her paystubs that stated that she earned "PTO" and "overtime." Sterling paid for her insurance, provided the tools that she needed to perform her job, and she was covered by Sterling's worker's compensation policy. Thus, Dr. Rahbar was Sterling's employee.

66.    Sterling and Titanium's actions have exposed Dr. Rahbar to loss of her medical license, civil liability, and criminal liability.

67.    For example, to properly supervise physician assistants there must be adequate practice agreements or delegation of services agreements. Business & Professions Code § 3502(a)(2). Sterling never had appropriate practice agreements or delegation of services agreements with its physician assistants.

68.    Furthermore, physician assistants must be adequately supervised by a physician to treat patients. "Supervision" means that a licensed physician and surgeon oversees the activities of, and accepts responsibility for, the medical services rendered by a physician assistant. Business & Professions Code § 3501 (f) (1). "The supervising physician has continuing responsibility to follow the progress of the patient and to make sure that the physician assistant does not function autonomously." 16 CCR § 1399.545.

69.     Dr. Rahbar was unable to assure that the physician assistants were not functioning "autonomously," because she had no knowledge that she was assigned to supervise them at the West Covina Clinic and the Bell Garden Clinic.

70.     Failing to properly supervise physician assistants can expose a physician to discipline by the Medical Board of California for aiding and abetting the unlicensed practice of medicine. *Khan v. Medical Board* (1993) 12 Ca.App.4th 1834, 1842.

71.     Moreover, aiding and abetting the unlicensed practice of medicine is a crime. Business & Professions Code § 2052(b).

72.     Submitting claims to Medi-Cal and Medicare for unsupervised work of NMPs, as Sterling and Titanium have done here, can lead to civil liability under the False Claims Act. *See, e.g., United States ex rel. Jeffrey H Byrd v. Acadia Healthcare Company, Inc. et. al,* Civil Action No. 18-312-JWD-EDW (M.D. La., March 23, 2022) (finding that improper supervision of nurse practitioners was "material" for the purposes of False Claims Act liability, because, *inter alia*, proper supervision goes to the "very essence" of the bargain between government payers and providers, and the existence prior government enforcement of the supervision requirement in False Claims Act litigation).

73.     Moreover, submitting a claim to Medi-Cal and Medicare that contains a false statement regarding the identity of the "ordering physician" or "referring provider," as Sterling and Titanium have done here, can lead to civil liability under the False Claims Act. *See, e.g., United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F.Supp.3d 734 (W.D. Tex. 2020) ("the Court finds that there is no genuine issue of material fact as to the materiality of claims that encompass the Wrong Provider Tranche. Strong evidence shows that the Government probably would not have reimbursed PVA for claims which listed the name of a

physician who did not render the services described therein had it known such claims had been submitted.")

74.    In short, Sterling and Titanium's actions have created an existential risk to Dr. Rahbar's livelihood.

75.    Under these circumstances, on or about February 23, 2022, Sterling constructively discharged Dr. Rahbar from her job. Her last day was scheduled for March 31, 2022, so she could properly transition her patients to the care of other providers.

## V.
## FIRST CAUSE OF ACTION
### ON BEHALF OF THE UNITED STATES
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### PRESENTING FALSE CLAIMS

### Against All Defendants

### (31 U.S.C. § 3729(a)(l)(A))

76.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

77.    Defendants knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

78.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(l)) presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare and Medi-Cal programs that were higher than they were permitted to claim or charge by applicable law.

79.    Among other things, Defendants knowingly caused to be submitted claims to Medicare and Medi-Cal under the name of a physician who was not the ordering or referring physician. Furthermore, Defendants knowingly submitted claims to Medicare and Medi-Cal for

the services provided by NMPs who were not supervised by a physician in compliance with federal and California law.

80.    Defendants knowingly made, used, caused to be made, and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

81.    The misrepresentations were "material," because neither the federal government nor the State of California would have paid the claims had they known that the NMPs were unsupervised or that Relator was not the referring provider.

82.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### SECOND CAUSE OF ACTION
**ON BEHALF OF THE UNITED STATES
VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
MAKING OR USING FALSE RECORDS OR STATEMENTS
MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS**

**Against All Defendants**

**(31 U.S.C. § 3729(a)(l)(B))**

83.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

84.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(l)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

85.    Among other things, Defendants knowingly caused to be submitted claims to Medicare and Medi-Cal under the name of a physician who was not the ordering or referring physician. Furthermore, Defendants knowingly submitted claims to Medicare and Medi-Cal for the services provided by NMPs who were not supervised by a physician in compliance with federal and California law.

86.     Among other things, Defendants knowingly submitted false claims for Medicare and Medi-Cal business.

87.      The misrepresentations were "material," because neither the federal government nor the State of California would have paid the claims had they known that the NMPs were unsupervised or that Relator was not the referring provider.

88.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**THIRD CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**RETENTION OF PROCEEDS TO WHICH NOT ENTITLED**

**Against All Defendants**

**(31 U.S.C. 3729(A)(l)(G))**

89.     Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

90.     Defendants knowingly made, used, caused to be made, or used a false record or statement material to an obligation to pay or transmit money property to the United States, or knowingly concealed or knowingly improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

91.     Defendants received far more money from the Medicare and Medi-Cal programs than they were entitled.

92.     Defendants knew that they had received more money than they were entitled to, and they avoided their obligation to return the excess money to the United States.

93.    The misrepresentations were "material," because neither the federal government nor the State of California would have paid the claims had they known that the NMPs were unsupervised or that Relator was not the referring provider.

94.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION
### ON BEHALF OF THE UNITED STATES
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### CONSPIRACY TO COMMIT VIOLATIONS OF THE FALSE CLAIMS ACT

### Against All Defendants

### (31 U.S.C. § 3729(a)(l)(C))

95.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

96.    Defendants conspired with each other to commit the violations alleged in this Complaint, including causes of action one, two, and three inclusive.

97.    Defendants performed acts, including falsifying medical records and submitting fraudulent documentation to effect the object of the conspiracy.

98.    The misrepresentations were "material," because neither the federal government nor the State of California would have paid the claims had they known that the NMPs were unsupervised or that Relator was not the referring provider.

99.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(l)(C) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FIFTH CAUSE OF ACTION
### ON BEHALF OF THE STATE OF CALIFORNIA
**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT PRESENTING FALSE CLAIMS**

### Against All Defendants

### (Cal. Gov. Code § 12651 (a)(l))

100. Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

101. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

102. Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

103. The State of California sustained damages because of Defendants' acts, in amounts to be proved at trial.

## SIXTH CAUSE OF ACTION
### ON BEHALF OF THE STATE OF CALIFORNIA
**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT MAKING OR USING FALSE RECORDS OR STATEMENTS TO OBTAIN PAYMENT OR APPROVAL OF FALSE CLAIMS**

### Against All Defendants

### (Cal. Gov. Code§ 12651 (a)(2))

104. Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

105. Defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims approved by the State of California, in violation of the California False Claims Act.

106. Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims involving State funds, in violation of the California False Claims Act.

107. Defendants' false records or statements had the natural tendency to influence, or were capable of influencing, the payment or receipt of money, property, or services.

108. The State of California sustained damages because of Defendants' acts, in amounts to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**ON BEHALF OF THE STATE OF CALIFORNIA**
**VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT INADVERTENT**
**SUBMISSION OF FALSE CLAIMS**

**Against All Defendants**

**(Cal. Gov. Code § 12651 (a)(8))**

109. Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

110. Defendants were the beneficiaries of inadvertent submissions of false claims, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claims.

111. To the extent any of Defendants' complained of acts were inadvertent at the time committed, Defendants subsequently discovered they had engaged in fraudulent billing practices and failed to disclose the facts to the State of California within a reasonable time of such discovery.

112. Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

113. The State of California sustained damages because of Defendants' acts, in amounts to be proved at trial.

### EIGHTH CAUSE OF ACTION
**ON BEHALF OF THE STATE OF CALIFORNIA
VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
CONSPIRACY**

**Against All Defendants**

**(Cal. Gov. Code§ 12651, subd. (a)(3)**

114. Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

115. Defendants conspired with each other to commit the violations alleged in this Complaint, including causes of action five, six, and seven, inclusive.

116. Defendants performed acts, including the submission of fraudulent billing information to effect the object of the conspiracy.

117. The conduct of Defendants violated California Government Code section 12651, subdivision (a)(3) and was a substantial factor in causing the State of California to sustain damages in an amount according to proof.

### NINTH CAUSE OF ACTION
**ON BEHALF OF PLAINTIFF ONLY
CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY**

**(Against Sterling Only)**

118.    Plaintiff incorporates herein by reference and realleges the allegations stated in this Complaint.

119.    At all relevant times Plaintiff was an employee of Sterling.

120.    Sterling's actions, as alleged herein, created a working environment so intolerable that a reasonable person in Plaintiff's position would have had no alternative but to resign.

121.    Plaintiff resigned due to Sterling's actions, as alleged herein.

122.    Sterling's violation of public policy was a substantial factor in causing Plaintiff harm.

123.    As an actual and proximate result of Sterling's constructive discharge of Plaintiff in violation of public policy, Plaintiff has suffered future economic harm, emotional distress, and other general damages.

124.    In constructively terminating Plaintiff in violation of public policy, Sterling acted willfully, knowingly, intentionally, maliciously, oppressively, or with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to punitive damages against Sterling for that conduct.

### NINTH CAUSE OF ACTION
**ON BEHALF OF PLAINTIFF ONLY**
**NEGLIGENCE**

**(Against Sterling Only)**

125.   Plaintiff incorporates herein by reference and realleges the allegations stated in this Complaint.

126.    Defendant owed a duty to Plaintiff to exercise ordinary care in the management of its property or person.

127.    Defendant negligently exposed Plaintiff to liability by assigning her patient panels without her knowledge and consent and listing her as the ordering or referring physician on CMS Form 1500s to government payers for NMPs that she did not supervise.

128.    Defendant further negligently exposed Plaintiff to liability by listing her as the "ordering physicians" or "referring provider" for procedures that she did not order.

129.    Defendant's negligence was a substantial factor in causing harm to Plaintiff.

130.    As an actual and proximate result of Sterling's negligence, Plaintiff has suffered future economic harm, emotional distress, and other general damages.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America, by and through Relator/Plaintiff and Plaintiff, individually, prays for relief against all Defendants as follows:

**A.  Pursuant to the False Claims Act:**

**<u>TO THE UNITED STATES OF AMERICA AND RELATOR</u>**

(1)    For civil penalties of up to $23,331 to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to be presented to Medicare or Medi-Cal for payment;

(2)    For treble damages resulting to the Medicare or Medi-Cal system from the conduct of Defendants, and each of them;

(3)    For pre and post-judgment interest;

(4)    For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

(5)    That Relator be awarded the maximum percentage of recovery allowed to her pursuant to the False Claims Act.

**B.  Pursuant to the California False Claims Act:**

**<u>TO THE PEOPLE OF CALIFORNIA AND RELATOR</u>:**

(6)    For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to presented to Medi-Cal for payment;

(7)    For treble damages resulting to the Medi-Cal system from the conduct of Defendants, and each of them;

(8)    For pre and post-judgment interest;

(9)     For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

(10)    That Relator be awarded the maximum percentage of any recovery allowed to her pursuant to the California False Claims Act.

**C.  Pursuant to California Common Law**

   **TO DR. RAHBAR ONLY**

(11)    Compensatory economic damages;

(12)    Compensatory general damages;

(13)    Punitive and exemplary damages according to proof;

(14)    Prejudgment interest on monetary damages to the extent permitted by law;

(15)    For other such further relief, including equitable relief, as this Court may deem just and proper.


Date: May 23, 2022                              THE BRINEGAR LAW FIRM

                                                _____
                                                Matthew A. Brinegar, Esq.
                                                Attorney for Plaintiff
                                                Mahnaz Rahbar, M.D


                         **JURY TRIAL DEMAND**

    Plaintiff hereby demands a trial by jury.


Date: May 23, 2022.                             THE BRINEGAR LAW FIRM

                                                _____
                                                Matthew A. Brinegar, Esq.
                                                Attorney for Plaintiff
                                                Mahnaz Rahbar, M.D