Matthew A. Brinegar, Esq. (SBN 277517)
THE BRINEGAR LAW FIRM
2000 Van Ness Avenue, Suite 512
San Francisco, CA 94109
Telephone: (415) 735-6856
Facsimile: (415) 529-4276
E-mail: mbrinegar@brinegarlaw.com

Attorney for Relator/Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA *ex rel*. MAHNAZ RAHBAR, M.D.<br><br>Plaintiff,<br><br>vs.<br><br>STERLING HOSPITALIST MEDICAL GROUP, INC.; TITANIUM HEALTHCARE, INC.; and DOES 1-20<br><br>Defendants. | Case No. 2:22-CV-03520-MRA-PA<br><br>**RELATOR'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date: September 19, 2024<br>Time: 1:30 p.m.<br>Judge: Hon. Mónica Ramírez Almadani |

//

//

//

//

//

//

//

# *Table of Contents*


*I. OVERVIEW OF WHY DEFENDANTS' MOTION MUST BE DENIED ---------- 6*

*II. SUMMARY OF THE ALLEGATIONS AND PROCEDURAL HISTORY ---------- 6*

*A. Summary of the Allegations ---------- 6*

*i. Titanium and Sterling Are an Integrated Enterprise ---------- 6*

*ii. Defendants Jointly Employed Dr. Rahbar in Their Integrated Enterprise ---------- 7*

*iii. Defendants Stole Dr. Rahbar's Identity to Fraudulently Bill Government Payers --- 8*

*iv. Defendants Constructively Discharged Dr. Rahbar ---------- 9*

*B. Procedural History ---------- 10*

*III. ARGUMENT ---------- 10*

*A. The False Claims Act and the California False Claims Act Are Construed Broadly 10*

*B. Rule 8(a) and 12(b)(6) ---------- 10*

*C. Rule 9(b) Standard ---------- 11*

*D. Dr. Rahbar's FCA and CFCA Claims Against Titanium Are Pled with Particularity 12*

*E. Dr. Rahbar's FCA and CFCA Claims Against Titanium Are Pled with Particularity 17*

*F. Dr. Rahbar Has Adequately Pled That Defendants Conspired with One Another -- 18*

*G. Dr. Rahbar's Retaliation Claim Is Proper ---------- 19*

*H. Dr. Rahbar Has Properly Alleged That She Was Defendants' Joint Employee ------ 20*

*I. Dr. Rahbar's Negligence Per Se Claim is Proper ---------- 21*

*IV. CONCLUSION ---------- 22*

# Table of Authorities

CASES

*O'Connor v. Uber Techs., Inc.* 82 F.Supp.3d 1133 (N.D. Cal. 2015)-------------------------- 20, 21
*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ---------------------------------------------------- 10, 11
*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)---------------------------------------------------10
*Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874 (9th Cir. 2022) ------------------------------ 7
*Ebeid ex rel. United States v. Lungwitz* 616 F.3d 993 (9th Cir. 2010)----------------------------11
*Fontana v. Haskin,* 262 F.3d 871 (9th Cir. 2001) ------------------------------------------------11
*In re Automotive Parts Antitrust Litigation*, 12-md-02311, 2014 WL 840272 (E.D. Mich. Mar. 4, 2014)-----------------------------------------------------------------------------------------11
*Interserve, Inc. v. Fusion Garage PTE Ltd*., Case No. C 09-5812 RS (PSG), 2011 WL 500497 (N.D. Cal. Feb. 9, 2011) ---------------------------------------------------------------------21
*Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097 (9th Cir. 2008) ------------------------19
*Menjivar v. Trophy Prop. IVDE, LLC,* Case No. C 06-03086 SI, 2006 WL 2884396, at *13 (N.D. Cal. Oct. 10, 2006) --------------------------------------------------------------------------- 21, 22
*Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d 801 (E.D. Tenn. 2015)------------------ 7
*Modglin v. DJO Global, Inc.*, 114 F.Supp.3d 993 (C.D. Cal. 2015) ---------------------------- 12, 13
*Moore v. CA. Institute of Tech*., 275 F.3d 838 (9th Cir. 2002)--------------------------------------19
*Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074 (9th Cir.1990)-----------------------22
*Moyo v. Gomez,* 32 F.3d 1382 (9th Cir. 1994) ---------------------------------------------------10
*Native Am. Arts, Inc. v. Duck House, Inc.*, No. 05 C 2176, 2007 WL 8045973 (N.D. Ill. Mar. 1, 2007)---------------------------------------------------------------------------------------------21
*S.G. Borello & Sons, Inc. v. Department of Indus. Relations*, 48 Cal.3d 341 (1989) --------- 20, 21
*San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal.App.4th 627 (2014) ---------------------------------------------------------------------------------------------10
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011)--------------------------------------------------------11
*U.S. ex rel. Bias v. Tangipahoa*, 816 F.3d 315 (5th Cir. 2016) -------------------------------------10

*United States ex rel. Jeffrey H Byrd v. Acadia Healthcare Company, Inc. et. al*, Civil Action No. 18-312-JWD-EDW (M.D. La., March 23, 2022) ---------------------------------------------------15
*United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667 (9th Cir. 2018) --------------- 11, 17
*United States ex rel. Turner v. Dynamic Medical Sys. LLC*, No. 1:17-cv-01757, 2022 WL 20804350 (E.D. Cal. Jan. 24, 2022)-----------------------------------------------------------------12
*United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)--- 11, 12, 13, 17, 22
*Vess v. Ciba-Geigy Corp. Usa,* 317 F.3d 1097 (9th Cir. 2003) --------------------------------------21

STATUTES

31 U.S.C. § 3729(l)(l)(A)------------------------------------------------------------------- 12, 17, 18
31 U.S.C. §3730(h)-----------------------------------------------------------------------------------19
31 U.S.C. §3730(h)(1)--------------------------------------------------------------------------------10
42 U.S.C. § 1395x(aa)(6) -----------------------------------------------------------------------------14
42 U.S.C. § 1395x(s)(2)(K)(i)-(ii)------------------------------------------------------------------14
Bus. & Prof. Code § 2725 -------------------------------------------------------------------- 14, 15
Bus. & Prof. Code § 2408 ---------------------------------------------------------------------------- 7
Bus. & Prof. Code § 3501 (f) (1) ---------------------------------------------------------- 14, 15
Cal. Gov. Code § 12651(a)(l) ----------------------------------------------------------12, 13, 17, 18

OTHER AUTHORITIES

https://files.medi-cal.ca.gov/pubsdoco/publications/masters-mtp/part2/nonph.pdf [DHCS manual for NMP billing]--------------------------------------------------------------15

REGULATIONS

16 CCR § 1399.545 -------------------------------------------------------------------------- 14, 15
16 CCR § 1472------------------------------------------------------------------------------------ 14, 15
16 CCR § 1474(b)(7)---------------------------------------------------------------------------- 14, 15

RULES

FRCP 12(b)(6)---------------------------------------------------------------------------- 10, 11, 22

FRCP 15 (a)(2) ---------------------------------------------------------------------------------------------22
FRCP 8(a)(2) ----------------------------------------------------------------------------------------------10
FRCP 8(a) ----------------------------------------------------------------------------------------------------- 8
FRCP 9(b) ---------------------------------------------------------------------------------------------passim

## I. OVERVIEW OF WHY DEFENDANTS' MOTION MUST BE DENIED

Defendants' Motion has no merit because, amongst other things:

- Defendants' chief medical officer ("CMO"), Dr. Jordan, knew that no one was supervising the non-physician medical providers ("NMPs") at the West Covina and Bell Gardens clinics, but with his approval, Defendants submitted hundreds of false claims to government payers for the services provided by the NMPs as if Relator Dr. Rahbar had been supervising them. Second Amended Complaint ("SAC") ¶¶65-67.
- Defendants jointly employed Dr. Rahbar, because they controlled how she performed her job duties, including which patients she could see, how many patients she could see, and when she could see them. They provided her with PTO, overtime, tools, a workspace, as well as malpractice and worker's compensation insurance. Defendants also had her sign an employee handbook, which stated that she was an at-will employee. SAC ¶¶88-89.
- Defendants constructively discharged Dr. Rahbar, because no reasonable employee would have remained after their employer made them a crime victim by stealing their identity to defraud the government. This is especially true when, after being exposed, Defendants refused to take prompt remedial action to disclose what had happened and to resolve the mess they had created. SAC ¶¶77-87.

## II. SUMMARY OF THE ALLEGATIONS AND PROCEDURAL HISTORY

### A. Summary of the Allegations

Defendant Sterling Hospitalist Medical Group, Inc. ("Sterling") is a California professional medical group that serves patients in Los Angeles County. "SAC". at ¶ 12. Defendant Titanium Healthcare, Inc. ("Titanium) is a "friendly" management services organization that provides administrative services to Sterling. *Id.* at ¶ 13.

#### i. <u>Titanium and Sterling Are an Integrated Enterprise</u>

Titanium and Sterling act as an integrated enterprise[1], because, among other things: (1) They share a common CMO, Dr. Joe Jordan, who handles the day-to-day operations of Sterling.

---

[1] These four factors are examined to determine whether there is an integrated enterprise: "(1) interrelation of operations; (2) common management; (3) centralized control of labor relations;

*Id.* at ¶ 4, 17; (2) Gray Miller is the chief executive officer ("CEO") and agent of service of process for both entities. *Id.* at ¶ 21.[2]; (3) Dr. Maron is Sterling's sole director and one of Titanium's directors. *Id.* at ¶ 21; (4) Titanium handled all the finances for both entities, including contracting and billing. *Id.* at ¶ 14; (5) Sterling has no website, and no employees. *Id.* at ¶ 15. While Relator was nominally working for Sterling, only "Titanium" was used as the practice's name. *Id.* at ¶ 15; (6) Titanium performed all labor relations for both entities, including hiring and firing. *Id.* at ¶ 18; (7) Sterling only works at clinics owned by Titanium. *Id.* at ¶ 20; (8) Lab results for Sterling patients were sent to Titanium, as opposed to Sterling. *Id.* at ¶ 22; and (9) Progress notes for care provided by Sterling providers state, "Titanium Healthcare," or a derivation thereof. *Id.*

ii. <u>Defendants Jointly Employed Dr. Rahbar in Their Integrated Enterprise</u>

Dr. Rahbar began working for Defendants on November 16, 2018. *Id.* at ¶ 53. She treated Medi-Cal and Medicare patients at a clinic owned and staffed by Titanium. *Id.* at ¶¶ 53-54. Dr. Rahbar's memorandum of understanding ("MOU") said that she was Sterling's independent contractor. *Id.* at ¶ 88. But she was really an employee of Defendants, because: (1) Both entities "assigned" her to supervise the NMPs *Id.*; (2) They dictated her patient load and when she could treat the patients. *Id.*; (3) They paid her hourly and could terminate her "without cause." *Id.*; (4) Her pay stubs showed that she earned "PTO" and "overtime." *Id.*; (5) They paid her malpractice insurance, provided her the tools needed to perform her job, and she was on their worker's compensation policy. *Id.*; and (6) Titanium had her sign an "employee handbook" that said that it was her "at will" employer. *Id.* at ¶89.

---

and (4) common ownership or financial control." *Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874, 877 (9th Cir. 2022). *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F.Supp.3d 801 (E.D. Tenn. 2015) (applying the integrated enterprise test to FCA actions).

[2] Mr. Miller's status as CEO is unlawful. Bus. & Prof. Code § 2408 ("each … officer of a medical … corporation … shall be a licensed person ..."). The SAC incorrectly cites Corp. Code § 13403. SAC at ¶ 21.

iii. <u>Defendants Stole Dr. Rahbar's Identity to Fraudulently Bill Government Payers</u>

On September 2, 2021, Dr. Jordan, Defendants' CMO and one of Titanium's directors, wrote to Dr. Rahbar, "Just to clarify as you may get a letter or email soon. We are moving our Baldwin Park local to West Covina … As you are listed as MD for some members Lorena will be sending a form to acknowledge. Its [sic] no real change …." *Id.* at ¶55.

On September 3, 2021, Dr. Rahbar received an email from Lorena Cuevas, a Titanium employee, stating, "I am the office manager for the Baldwin Park and Bell Gardens office; I have attached the letter that we need to send our IPA's as well as HMO companies informing them of our move. Since you are one of our doctors that is contracted with them, we need to have you sign it and send it back to me so we can send it out …." *Id.* at ¶56.

Shortly thereafter, Dr. Jordan spoke with Dr. Rahbar about being the provider "on paper" for patients treated at Titanium's West Covina and Bell Gardens clinics. *Id.* at ¶¶57-58. Dr. Rahbar refused to go along with this scheme, despite Dr. Jordon's on November 1, 2021 that "It really only involves a letter. There is no requirement to be there" and "Extra $$!." *Id.* at ¶59.

In fact, without her knowledge or consent, Titanium had already assigned these panels to Dr. Rahbar at least four months prior to Dr. Jordan's texts. These patient panels consisted of individuals that Dr. Rahbar was supposedly responsible for treating, either personally or through the NMPs that she supervised. Defendants, through their agent, Dr. Jordan, had knowledge of, and approved of, Titanium's use of Dr. Rahbar's medical license to fraudulently bill government payers for services she neither performed herself, nor supervised the NMPs who did. *Id.* at ¶65.

As a result of the unauthorized assignment of patient panels, Titanium listed her as the "ordering physician" or "referring provider" for dozens of tests for patients that she has never seen, much less treated. Moreover, the NMPs treated Medi-Cal and Medicare patients hundreds of times without being supervised by a physician. Defendants' agent, Dr. Jordan, approved of submitting these claims to government payers, despite knowing that Dr. Rahbar had not supervised the NMPs or ordered the tests. *Id.* at ¶66.

Titanium submitted these fraudulent claims to Medi-Cal and Medicare on CMS Form 1500s for primary care visits on Sterling's behalf and with Dr. Jordan's knowledge and

permission. Defendants knew that the NMPs were not supervised by a physician. Moreover, Titanium caused to be presented numerous claims to government payers for diagnostic tests by fraudulently listing Relator as the "ordering physician" or "referring provider," when she neither saw the patients nor supervised the NMPs that did. Said presentation of claims was done with the knowledge of, and approval of, Defendants through their agent, Dr. Jordan. *Id.* at ¶67. Defendants assigned these patient panels to Dr. Rahbar, because they needed a doctor on paper to "supervise" NMPs. By having NMPs treat patients without any supervision, they would achieve higher profits at the expense of appropriate patient care. *Id.* at ¶76.

iv. Defendants Constructively Discharged Dr. Rahbar

On or about February 3, 2022, Dr. Rahbar learned that Titanium, with Sterling's knowledge and approval, had listed her as the provider for the West Covina Clinic and Bell Garden Clinic patient panels without her prior knowledge or consent. *Id.* at ¶77.

The following day, Dr. Rahbar demanded that Defendants remove her from the patient panels. She wrote to Dr Jordan, "This [i.e., listing her as the physician for the West Covina Clinic and Bell Garden Clinic patient panels] was done months before you even discussed the subject with me. Even though I repeatedly communicated my lack of interest to you, you went against my wishes and still kept my name on the list. Labs and imaging results continue to be ordered in my name even after our conversations. These are on patients who I haven't seen, examined, written any orders on or discussed with anyone." *Id.* at ¶81.

On February 8, 2022 and February 9, 2022, Dr. Rahbar demanded to be removed from the patient panels. *Id.* at ¶¶82-83. On or about February 11, 2022, Titanium finally notified two IPAs that Dr. Rahbar should be removed from these patient panels. *Id.* at ¶84.

On or about February 23, 2022 and March 21, 2022, Dr. Rahbar demanded Defendants to provide her a "complete disclosure" of all patient assignments, so that she could discover whether she had been assigned to additional patient panels without her authorization. *Id*. at ¶¶85-86. Defendants have refused to provide a complete disclosure to Dr. Rahbar of all patient panels that they had assigned to her. *Id.* at ¶87.

Due to Defendants' betrayal and their creation of an existential risk to her license and livelihood, on or about February 23, 2022, Defendants constructively discharged Dr. Rahbar from her job effective March 31, 2022. *Id.* at ¶99.

**B. Procedural History**

Dr. Rahbar filed her complaint on May 24, 2022. ECF #1. Dr. Rahbar filed her first amended complaint on March 21, 2024 to add a cause of action under 31 U.S.C. §3730(h)(1). ECF #25. She amended again on April 30, 2023. ECF #30.

**III. ARGUMENT**

**A. The False Claims Act and the California False Claims Act Are Construed Broadly**

"Because the FCA is 'remedial,' its provisions are to be construed 'broadly to effectuate its purpose.'" *U.S. ex rel. Bias v. Tangipahoa*, 816 F.3d 315, 324 (5th Cir. 2016).

The CFAC "should be given the broadest possible construction consistent with that purpose. [It] must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides." *San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal.App.4th 627, 638 (2014) (internal quotations omitted).

**B. Rule 8(a) and 12(b)(6)**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 672. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (internal quotation marks and citation omitted).

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez,* 32 F.3d 1382, 1384 (9th Cir. 1994).

"Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief." *Fontana v. Haskin,* 262 F.3d 871, 877 (9th Cir. 2001).

"The plausibility standard is not akin to a 'probability requirement …." *Iqbal*, 556 U.S. at 678. "If there are two alternative explanations, one advanced by defendant and the other advanced by Relator, both of which are plausible, Relator's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Accordingly, a relator "need not rule out all possible innocent explanations." *In re Automotive Parts Antitrust Litigation*, 12-md-02311, 2014 WL 840272 (E.D. Mich. Mar. 4, 2014).

**C. Rule 9(b) Standard**

Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

The Ninth Circuit does not "embrace the … categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation …. in accord with general pleading requirements under Rule 9(b), … it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz* 616 F.3d 993, 998–999 (9th Cir. 2010) (internal quotation marks and citation omitted).

"Because this standard does not require absolute particularity or a recital of the evidence … a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud ...." *United States v. United Healthcare Ins. Co*., 848 F.3d 1161, 1180 (9th Cir. 2016). "[A] complaint need not distinguish between defendants that had the exact same role in a fraud … A good claim against one defendant did not become inadequately simply because a co-defendant was alleged to have committed the same wrongful acts." *United States ex rel. Silingo v. Wellpoint, Inc*., 904 F.3d 667, 677 (9th Cir. 2018).

"Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b)... is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a

responsive pleading." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (internal citation omitted).

**D. Dr. Rahbar's FCA and CFCA Claims Against Titanium Are Pled with Particularity**

Defendants claim that Dr. Rahbar does not allege who at Titanium submitted the false claims. Motion at p. 7. But Dr. Jordan is Titanium's CMO and director. SAC at ¶¶4, 17, 57. He knew that Dr. Rahbar was not supervising the NPMs, had not treated the patients, and had not ordered the tests, yet he approved the use of her license to bill government payers. *Id.* at ¶¶65-67.

Liability attaches under the FCA and CFCA when a person knowingly "causes to be presented, a false or fraudulent claim." 31 U.S.C. § 3729(l)(l)(A); Cal. Gov. Code§ 12651(a)(l). Dr. Jordan, Defendants' managing agent, caused false or fraudulent claims to be presented by approving their submission. SAC ¶¶65, 67.

Defendants' authorities are inapposite. In *Modglin v. DJO Global, Inc*., 114 F.Supp.3d 993, 1014 (C.D. Cal. 2015) the complaint failed to "identify any sales representatives who engaged in off-label promotion, or any manager or executive who directed or sanctioned off-label promotion ...." The court found that the relator failed to identify *who* made the fraudulent statements, either by name or job title. *Id.* at 1016.

*Modglin's* holding is irrelevant because Dr. Rahbar has not pled that Defendants made false statements while promoting the usage of a drug. Rather, this is a case about submitting claims "for services provided by nurse practitioners and physician assistants who were not supervised by a physician, and causing to be presented claims for laboratory tests and radiology examinations with the Relator as the 'ordering physician' or 'referring provider,' even though she had not ordered the tests or examinations, nor supervised the mid-levels who had." SAC ¶2.

To the extent this case is at all analogous to *Modglin,* Dr. Rahbar has satisfied the "who" standard, because she has identified a "manager or executive who directed or sanctioned" the false claims: Dr. Joseph. SAC ¶¶65, 67. There is no requirement that Dr. Rahbar must identify the biller who mechanically submitted the claims, because Dr. Joseph—by approving them with knowledge of their falsity—caused them to be presented. 31 U.S.C. § 3729(l)(l)(A); Cal. Gov.

Code § 12651(a)(l); *see also United Healthcare Ins. Co*., 848 F.3d at 1180 (Rule 9(b) does not require pleading "the precise method used to carry out the fraud.")

*United States ex rel. Turner v. Dynamic Medical Sys. LLC*, No. 1:17-cv-01757, 2022 WL 20804350 (E.D. Cal. Jan. 24, 2022) is also inapposite. Like with *Modglin*, *Turner* is a fraudulent marketing case, wherein the defendant was falsely claiming that its machine could perform "high complexity tests." *Id.* at *1-2. The relators failed to allege the fraudulent scheme with sufficient particularity, because they did not "specify any details of these meetings or when they took place, [and did] not identify any specific customers who were presented with these documents or the circumstances of any discussions." *Id.* at *12.

Here, by contrast, Dr. Rahbar has provided exacting details of Defendants' fraudulent scheme, including the who, what, when, where, and how: For the "<u>who</u>," Defendants submitted the false claims with the knowledge and approval of their CMO, Dr. Jordan. SAC ¶¶65-67. Also, Dr. Rahbar identified the names of the unsupervised NMPs, i.e., PA Ocampo and NP Kynard. SAC ¶¶68-75.

For the "<u>what</u>," Defendants submitted claims for services provided by NMPs who were not supervised by a physician and caused to be presented claims for laboratory tests and radiology examinations with the Relator as the "ordering physician" or "referring provider," even though she had not ordered the tests or examinations, nor supervised the mid-levels who had. SAC ¶2, 66.

For the "<u>when</u>," Defendants submitted fraudulent claims from at least July 2021 (i.e., four months before Dr. Jordan's texts) until at least February 2022. SAC ¶¶59, 65, 84.

For the "<u>where</u>," Defendants submitted the claims for unsupervised work at the West Covina and Bell Garden clinics. SAC ¶65.

For the "<u>how</u>," Defendants falsely assigned patient panels to Dr. Rahbar without her knowledge and consent, and they falsely listed her as the "ordering physician," or "referring provider" on CMS 1500 forms submitted to government payers. SAC ¶¶65-66.

Defendants claim that there was nothing wrong with making Dr. Rahbar the supervising physician only "on paper," because there was no requirement that she physically be present at the

location where the NMPs practiced. Motion at pp. 7-8. But, as alleged[3], "supervision" requires the physician to "oversee[] the activities of, and accept[] responsibility for, the medical services provided by" physician assistants. Bus. & Prof. Code § 3501 (f)(1). And the supervising physician has a continuing responsibility to follow the progress of the patient and to make sure that the physician assistants do not practice autonomously. 16 CCR § 1399.545. Dr. Rahbar *could not* have supervised the care of patients at the West Covina and Bell Garden Clinics, because she had no knowledge that she had been assigned those patients. SAC ¶¶65, 93.

Supervising nurse practitioners, moreover, requires standardized procedures. 16 CCR § 1472. Standardized procedures are the legal mechanism for nurse practitioners to perform functions. Bus. & Prof. § 2725. They "[s]pecify the scope of supervision required for performance of standardized procedure functions, for example, immediate supervision by a physician." 16 CCR § 1474(b)(7).

Defendants claim that Dr. Rahbar only alleged that they did not have "appropriate" standardized procedures. Motion at p. 9. But Dr. Rahbar alleged, "Nor were there *any* standardized procedures for the nurse practitioners." SAC ¶93 (emphasis added). The use of "appropriate" comes from 42 U.S.C. § 1395x(s)(2)(K)(i)-(ii), which requires "collaboration" between the nurse practitioners and supervising physicians. 42 U.S.C. § 1395x(aa)(6) defines "collaboration" as "medical direction and *appropriate* supervision as provided for in jointly developed guidelines or other mechanisms as defined by the law of the State in which the services are performed." (Emphasis added). Here, there were no "appropriate" standardized procedures, because they did not exist at all. SAC ¶93.

Services of a nurse practitioner must also be performed under the "general supervision" of a physician. SAC ¶¶47-49. Not only did Dr. Rahbar not have standardized procedures with the nurse practitioner, but she could not have provided any level of supervision for the patient panels that were assigned to her without her knowledge or consent. SAC ¶¶65-67.

---

[3] SAC ¶¶65, 92-93.

Dr. Jordan knew that no one was supervising the NMPs, but with his approval, Defendants submitted claims to government payers for the services provided by the NMPs, and with Dr. Rahbar falsely listed as the "ordering physician," or "referring provider" *Id.*

Further, by asking her to pretend to supervise the NMPs, Dr. Jordan was asking Dr. Rahbar to join Defendants' preexisting scheme to defraud government payers in exchange for "Extra $$!". She would be serving as the NPMP's supervisor only "on paper," and would have no other responsibilities, i.e., "its [sic] no real change" … "It really only involves a letter." SAC ¶¶ 55, 59. Thus, if she had accepted Defendants' offer, she would not have been supervising the physician assistants in compliance with the law, because merely being listed "on paper" as their supervisor, does nothing to ensure that the physician assistants are not acting autonomously. 16 CCR § 1399.545. Dr. Rahbar would also not be following the progress of the patients or "oversee[ing]" the physician assistants care of them. Bus. & Prof. Code § 3501 (f) (1); 16 CCR § 1399.545. The same is true for the nurse practitioners. "Only" a letter to an IPA listing Dr. Rahbar as a supervising physician is not a standardized procedure, nor does it entail any "general supervision" of the nurse practitioner. https://files.medi-cal.ca.gov/pubsdoco/publications/masters-mtp/part2/nonph.pdf [DHCS manual for NMP billing]; 16 CCR § 1472; 16 CCR § 1474(b)(7); Bus. & Prof. Code § 2725.

Dr. Rahbar refused to be involved in this scheme. SAC ¶ 59. Nevertheless, with Dr. Jordan's knowledge and approval, Defendants continued to submit claims to government payers through at least February 2022, as if she was supervising the NMPs. SAC ¶¶ 77-78.

It is undisputed that submitting claims to government payers without supervision of NMPs is material and can lead to civil liability under the FCA. *See, e.g., United States ex rel. Jeffrey H Byrd v. Acadia Healthcare Company, Inc. et. al*, Civil Action No. 18-312-JWD-EDW (M.D. La., March 23, 2022) (improper supervision of NMPs was "material" for the purposes of FCA liability, because, *inter alia*, proper supervision goes to the "very essence" of the bargain between government payers and providers).

Defendants dismiss Dr. Jordan's texts as "routine personnel communications" that did not amount to an implicit request to engage in unlawful conduct. Motion at p. 9. But Defendants

ignore the totality of the allegations and concentrate solely on one of Dr. Jordan's comments, "There is no requirement to be there." *Id*. But Dr. Jordan also said that it "only involves a letter." SAC ¶59. As discussed, *supra,* this is false, because Dr. Rahbar had to have standardized procedures for nurse practitioners and to provide them "general supervision." She also had to oversee the activities of the physician assistants, ensure that they were not practicing autonomously, and follow the progress of the patients. By requesting that Dr. Rahbar serve as the supervisor for the NMPs "on paper" only, he was asking her to violate these rules. SAC ¶63.

Regardless, Dr. Jordan did not have to invite Dr. Rahbar to participate in the fraud to violate the FCA. Dr. Rahbar told Dr. Jordan that she would not supervise the NMPs for the clinics. SAC ¶59. Dr. Jordan knew that no one was supervising the NMPs, yet he approved Defendants' submission of claims for the services provided by the NMPs, and with Dr. Rahbar fraudulently listed as the "ordering physician," or "referring provider." SAC ¶¶65-67.

Defendants also complain that "There are no allegations about when Jordan first became aware that any allegedly fraudulent claims were submitted." (Motion at p. 10.) But Dr. Jordan was intimately tied up with listing Dr. Rahbar's name on the patient panel for billing purposes, through multiple emails, texts, and meetings. SAC ¶¶55-57, 81. Dr. Jordan knew that no one was supervising the NMPs from at least September 2021, when he asked Dr. Rahbar to be the supervisor on paper, as there would have been no other reason to ask her. *Id.* Dr. Rahbar told Dr. Jordan that he "went against [Dr. Rahbar's] wishes and still kept [her] name on the [patient panel] lists." SAC ¶81. And, as a result, "[l]abs and imaging results" continued to be ordered in her name, even though she had not been "seen, examined, written any orders or discussed with anyone." *Id*. Dr. Jordan also knew that claims were being submitted, because he needed the "letter" to the IPAs confirming her fake supervision to continue to bill for the NMPs. SAC ¶59.

Defendants complain, "There are no allegations that he directed anyone to submit such claims or submitted them himself ...." Motion at p. 10. But the SAC repeatedly alleges that he "approved" the submission of fraudulent claims with knowledge of their falsity. SAC ¶¶65-67. Since Dr. Jordan "approved" them, he caused them to be presented to government payers in violation of the FCA and CFCA. 31 U.S.C. § 3729(l)(l)(A); Cal. Gov. Code§ 12651(a)(l).

To the extent that Defendants are demanding that Dr. Rahbar plead Dr. Jordan's knowledge and intent with even more particularity, Rule 9(b) states that "intent, knowledge, and other conditions of a person's mind may be alleged generally."

**E. Dr. Rahbar's FCA and CFCA Claims Against Titanium Are Pled with Particularity**

As set forth, *supra,* Titanium and Sterling were an integrated enterprise. SAC ¶¶14-23. "[A] complaint need not distinguish between defendants that had the exact same role in a fraud …." *Wellpoint*, 904 F.3d at 677. So, Dr. Rahbar does not have to separately plead the roles of either Defendant. And Dr. Rahbar had no obligation to plead "the precise method used to carry out the fraud," including the "precise time frame …." *United Healthcare*, 848 F.3d at 1180.

Even in the absence of *Wellpoint* and *United Healthcare.* Dr. Rahbar has satisfied her pleading requirements. She has alleged that Sterling—through its agent, Dr. Jordan—approved the submission of false claims when he knew that the NMPs were not supervised. SAC ¶¶4 ["Defendants' chief medical officer, Dr. Joe Jordan"], 65-67. Dr. Jordan asked Dr. Rahbar to engage in fraudulent conduct "on behalf of Sterling and Titanium …." SAC ¶¶60, 63-64.

Defendants complain that the SAC does not plead with particularity "how Jordan was acting as the agent of Titanium, that he directed anyone to engage in the alleged conduct, that he knew about the alleged conduct, that he approved it, or that he submitted the allegedly fraudulent claims or made the allegedly fraudulent certifications." (Motion at pp. 11-12.)

But Dr. Jordan was the agent for both Defendants, because he held an executive position with both entities: CMO. SAC ¶4. The day-to-day management of Sterling's providers was handled by Dr. Joseph. SAC ¶17. And Dr. Rahbar was supervised by him. SAC ¶18. Dr. Rahbar knew that Dr. Jordan served as the CMO for both entities, because she worked for Defendants for several years. SAC ¶12. Dr. Jordan was also one of Titanium's directors and is listed as the CMO on Titanium's website. SAC ¶57.

Further, the SAC alleged that he approved the submission of claims with knowledge of their falsity. SAC ¶¶65-67. A medical practice's director, day-to-day manager, and CMO approval of the submission of false claims is sufficient for liability, because the approvals caused the false claims to be presented. 31 U.S.C. § 3729(l)(l)(A); Cal. Gov. Code§ 12651(a)(l). As

such, Dr. Rahbar was not required to plead that Dr. Jordan was the one who mechanically "submitted the allegedly fraudulent claims or made the allegedly fraudulent certifications."

Dr. Rahbar also does not have to allege particularized facts regarding Dr. Jordan's state of mind, including his knowledge "about the alleged conduct." Rule 9(b). Even in the absence of Rule 9(b), Dr. Rahbar has pled sufficient facts to show Dr. Jordan's knowledge and approval of the fraudulent scheme. *See, supra*, at pp. 16-17.

**F. Dr. Rahbar Has Adequately Pled That Defendants Conspired with One Another**

Defendants conspired together to submit fraudulent claims to government payers. SAC ¶¶118-119. This included submitting claims for NMP services without a supervising physician, and falsely listing Dr. Rahbar as the "ordering physician," or "referring provider." SAC ¶¶2, 65-67. This was accomplished through Defendants' joint agent: Dr. Jordan. *Id*.

Defendants complain, "there are no allegations, stated with particularity, showing what his relationship with Sterling was, how he did anything to conspire with anyone else at Sterling to submit fraudulent claims, or who that person may have been. The SAC does not allege that he submitted the claims or made any false certifications, that he assigned Rahbar to the patient panels at issue or directed someone else to assign her, or that he otherwise engaged in any concerted action with Sterling, or vice versa." (Motion at p. 13.)

But Dr. Jordan was Sterling's CMO, and he managed its day-to-day operations. SAC ¶4, 17. Defendants conspired with each other, because their joint agent, Dr. Jordan, knew that Dr. Rahbar had not agreed to supervise the NMPs for the patient panels for the West Covina and Bell Garden clinics. SAC ¶59. Despite this knowledge, Dr. Jordan approved Defendants' submission of claims for the services provided by the NMPs, and with Dr. Rahbar falsely listed as the "ordering physician," or "referring provider." SAC ¶¶65-67. Dr. Jordan was not required to submit the claims himself, because his approval caused the submission of the false claims. 31 U.S.C. § 3729(l)(l)(A); Cal. Gov. Code §12651(a)(l). Whether Dr. Jordan originally assigned Dr. Rahbar the patient panels is irrelevant. He knew that Dr. Rahbar had refused to be listed as the supervising physician in September 2021—despite his entreaties of "Extra $$!"—yet Dr. Jordan "kept [her] name on the list" until at least February 2022. SAC ¶82.

**G. Dr. Rahbar's Retaliation Claim Is Proper**

31 U.S.C. §3730(h) prohibits discharging anyone, "because of … efforts to stop 1 or more violations of this subchapter."

In or around September 2021 and November 2021, Dr. Rahbar engaged in protected activity by refusing to violate the FCA by agreeing to act as the fake supervisor for the patient panels. SAC ¶59. In February 2022, she further engaged in protected activity by investigating and reporting to Dr. Jordan and others that she had been fraudulently assigned to patient panels without her knowledge or consent. SAC ¶¶81-86.

For constructive discharge, a person must allege facts showing that a "reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory conditions." *Moore v. CA. Institute of Tech*., 275 F.3d 838, 847-848 (9th Cir. 2002). Retaliation claims need not be plead with particularity. *Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097, 1103 (9th Cir. 2008).

A reasonable person in Dr. Rahbar's situation would have found the working conditions intolerable. Defendants stole her identity (e.g., her medical license number) to fraudulently bill government payers. SAC ¶77-80. Defendants also requested that she defraud government payers by pretending to be the NMPs supervisor "on paper." SAC ¶¶65-67. Further, Defendants stole her identity even after Dr. Rahbar prohibited them from listing her as the provider for the patient panels. SAC ¶59. When Dr. Rahbar discovered the crime, Defendants failed to immediately rectify the problem, or provide a complete disclosure of what they had done. SAC ¶¶81-87. Defendants also lied by omission by not informing Dr. Rahbar that they had listed her as the provider for the patient panels since at least June 2021. SAC ¶65.

No reasonable person could remain in this lawless workplace. Defendants betrayed her trust by using her identity despite her explicit instructions not to do so. She could not possibly trust Defendants not to continue to steal her identity, or not to violate other laws governing the practice of medicine. She could not remain in a workplace that had involuntarily roped her into a scheme to aid and abet the unlicensed practice of medicine and to violate the FCA. SAC ¶¶94-96. She reasonably feared that Defendants' actions had exposed her to the potential loss of her

medical license, civil liability, and criminal liability. SAC ¶90. What reasonable employee would continue to work for an employer who had committed a crime against them?

**H. Dr. Rahbar Has Properly Alleged That She Was Defendants' Joint Employee**

Defendants claim that her constructive discharge claim must be dismissed, because she was a contractor. Motion at pp. 14-15. But "a hiree's status as either an employee or independent contractor should typically be determined by a jury, and not the judge." *O'Connor v. Uber Techs., Inc.* 82 F.Supp.3d 1133, 1148 (N.D. Cal. 2015).

*S.G. Borello & Sons, Inc. v. Department of Indus. Relations*, 48 Cal.3d 341, 350–351 (1989) holds, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired .... However, the control test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." *Id.* (internal quotations omitted). So, the Court listed "secondary indica," including:

> (a) whether the [worker] is engaged in a distinct occupation … ; (b) the kind of occupation …; (c) the skill required (d) [who] supplies the instrumentalities, tools, and the place of work …; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether … the work is a part of the regular business of the principal; and (h) whether … the parties believe they are creating [an employment relationship].

*Id.* ("Generally, ... the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.")

Defendants claim that Dr. Rahbar failed to allege that Defendants had the ability to "control the manner and means of accomplishing the desired result." Motion at p. 15. But they dictated how she could treat patients, including which patients, the number of patients, and when she could treat them. SAC ¶88. Dr. Rahbar was also hired to supervise NMPs, and Defendants dictated which NMPs she would supervise and when. *Id.* An entire employee handbook governed how she would perform her job. *Id.* at ¶89. Dr. Jordan—another physician—also supervised Dr. Rahbar. *Id.* at ¶57.

The secondary indica largely favor classifying Dr. Rahbar as an employee. Defendants provided the tools and location to perform the work. *Id.* at ¶88. Her employment was for an indefinite period, and she could be terminated at will. *Id.* She was paid hourly, as opposed to by the job. *Id.* Further, Defendants granted her "PTO" and "overtime," which is inconsistent with an independent contractor relationship. *Id.* Defendants paid for her malpractice insurance, and she was covered by their workman's compensation policy. *Id.* Contractors are not eligible for workman's compensation. *S.G. Borello & Sons, Inc.,* 48 Cal.3d at 349. Defendants were engaged in practicing medicine, making Dr. Rahbar's work part of their regular business. Finally, it is unclear whether the parties intended to create an independent contractor relationship. While the MOU recites that Dr. Rahbar is a contractor, Defendants also had her sign an employee handbook, stating that she was an at-will employee. *Id*. at ¶89. Regardless, it is "clear that the label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." *Uber Techs., Inc.* 82 F.Supp.3d at 1140. Taken together—especially on a motion to dismiss—these factors militate in favor of classifying her as an employee.

**I. Dr. Rahbar's Negligence Per Se Claim is Proper**

Defendants claim that Dr. Rahbar must plead all aspects of her negligence per se claim with particularity. Motion at pp. 15-16. But "Rule 9(b)'s heightened pleading requirements [apply] only to 'averments' of fraud supporting a claim rather than to the claim as a whole ...." *Vess v. Ciba-Geigy Corp. Usa,* 317 F.3d 1097 (9th Cir. 2003).

Plaintiffs are *not* required to plead damages with particularity. *See, e.g., Native Am. Arts, Inc. v. Duck House, Inc.*, No. 05 C 2176, 2007 WL 8045973, at *3 (N.D. Ill. Mar. 1, 2007); *Interserve, Inc. v. Fusion Garage PTE Ltd*., Case No. C 09-5812 RS (PSG), 2011 WL 500497, at *3 (N.D. Cal. Feb. 9, 2011); *Menjivar v. Trophy Prop. IVDE, LLC,* Case No. C 06-03086 SI, 2006 WL 2884396, at *13 (N.D. Cal. Oct. 10, 2006) (*Accord*; "As such, plaintiff's allegations in the FAC, including 'being forced to miss significant portions of work-related activities to respond to said misrepresentations,' and 'suffer[ing] considerable mental suffering, anxiety, humiliation, and emotional distress,' suffice to withstand this Rule 12(b)(6) motion to dismiss.")

Dr. Rahbar has alleged that she "has suffered future economic harm, emotional distress, and other general damages" due to Defendants' negligence. SAC ¶154. Said damages are for the lost income caused by the constructive discharge. *Id*. at ¶99. The constructive discharge as well as Defendants' betrayal of her trust have caused the emotional distress. *Id*. at ¶79. This is more than sufficient to satisfy Rule 8. *Menjivar v. Trophy Prop. IVDE, LLC,* Case No. C 06-03086 SI, 2006 WL 2884396, at *13 (N.D. Cal. Oct. 10, 2006).

Defendants also complain "the SAC does not state with particularity who at Sterling or Titanium willfully obtained what personal identifying information of plaintiff, when they obtained it, or how they used it for an unlawful purpose." Motion at pp. 16-17. But Dr. Rahbar had no obligation to plead "the precise method used to carry out the fraud," including the "precise time frame …." *United Healthcare Ins. Co*., 848 F.3d at 1180.

Regardless, Dr. Jordan had knowledge and approved the use of Dr. Rahbar's identity to bill government payers. SAC ¶¶65-67; 82 (Dr. Jordan "kept [her] name on the list" until at least February 2022, contrary to her instructions). Dr. Jordan's scheme started in approximately June 2021, when Dr. Rahbar's identity was first appropriated. SAC ¶65. The personal identifying information was Dr. Rahbar's medical license number. SAC ¶80. Dr. Jordan used her medical license number to bill government payers for NPMs that she had not supervised, and with Dr. Rahbar falsely listed as the "ordering physician," or "referring provider." SAC ¶¶65-67.

## IV. CONCLUSION

Defendants' motion should be denied. If the Court identifies any defects in the Complaint, Dr. Rahbar respectfully requests leave to file an amended complaint. FRCP 15 (a)(2) (leave to file an amended complaint is freely given). "This policy is to be applied with extreme liberality." *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990).

//

//

//

//

//

Respectfully submitted,

Dated: August 29, 2024

THE BRINEGAR LAW FIRM

By:/s/ Matthew Brinegar
MATTHEW BRINEGAR
Attorney for Relator/Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of August, 2024, I caused to be electronically filed and served the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

BUCHALTER
A Professional Corporation
ANDREW H. SELESNICK
Email: aselesnick@buchalter.com
PHILIP A. SCARBOROUGH
Email: pscarborough@buchalter.com
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Attorneys for Defendants

Dated: August 29, 2024

THE BRINEGAR LAW FIRM

By: /s/ Matthew Brinegar
MATTHEW BRINEGAR
Attorney for Relator/Plaintiff